# CIRCUIT COURT OF THE CITY OF NORFOLK

In re Estate of
Cleo L. Eppes,
deceased

August 13, 2012

Case No. (Civil) CL09-3618

By Judge Louis A. Sherman

## I. *Procedural History*

This Court referred the current matter to the Commissioner of Accounts. The Commissioner was asked to take evidence and make factual and legal findings to determine whether Administratrix, *c.t.a.*, Karen Fortier ("Fortier") is justified in reducing the share of the Estate otherwise distributable to Mary Martin ("Mary"). Fortier and Bryan and Gregory Eppes contend that, but for Mary's interference, the Estate would have sold the Property for $500,000, $61,400 more than its ultimate sale price. Fortier and Bryan and Gregory Eppes believe that Mary's actions also caused the Estate to incur expenses that it would not have had to incur were it not for Mary's dilatory actions.

After holding a hearing on September 27, 2011, and receiving several rounds of submissions on the subject matter, the Commissioner of Accounts ultimately determined in his report that Mary "substantially interfered with the efficient administration of the Estate to such a degree that Fortier will be justified in reducing the share of the Estate otherwise distributable to M[ary]." (*Id.* at 11.) The Report goes on to allocate the expenses in question between those to be paid by the Estate and those to be paid by Mary. (*Id.* at 17-25.)

In response to the Commissioner of Accounts' Report, Mary filed a series of objections and exceptions. This Court held a hearing on those objections and exceptions on July 10, 2012. After fully and carefully considering all of the evidence presented to the Commissioner of Accounts, the arguments of counsel made in written submissions to the Commissioner, and the written submissions and oral arguments presented to the Court, for the following reasons, this Court upholds the Commissioner's Report in significant part and does not sustain it as to one lesser matter.

## II. *Background*

Cleo Eppes ("Cleo") died on March 18, 2007 and left two surviving children, James Eppes ("James") and Mary Martin ("Mary"), and two grandchildren, Bryan and Gregory Eppes (collectively "the Brothers"), the surviving children of Cleo's predeceased son, Roy. Under the laws of intestacy, James, Mary, and the Brothers would each receive one-third of Cleo's estate, with Bryan and Gregory sharing equally their late father's one-third share.

By way of further background, in 1996, James took his mother, Cleo, to a lawyer and had a will drafted; however, this will was lost at the time of Cleo's death. When Cleo died, Martha Eppes, the Brothers' mother and Cleo's daughter-in-law, attempted to contact Mary about the Estate. Martha was curious about the 1996 will, and ultimately discovered that, in 2007, a mere eleven days before her passing, Cleo had executed a new will leaving virtually her entire estate to Mary and $100 to James with nothing for the Brothers. Evidence suggests that, at the time the 2007 will was executed, Cleo was terminally ill, was subject to a do-not-resuscitate order, was on morphine for pain management, and had simply marked the will with an "X" as her signature. (Comm'r's Report, 3.)

Believing that Cleo's 2007 will was created as a result of Mary's undue influence, Martha Eppes appeared in the Norfolk Circuit Court on May 23, 2008, and qualified as the administratrix of Cleo's Estate. Martha designated the Estate as a "small estate" with less than $15,000 of total assets. No one challenged Martha's qualification within the statutorily proscribed six month period. (*Id.*) On May 12, 2008, Mary appeared in the Norfolk Circuit Court to probate the 2007 will and qualified as executrix under that will. Again, no one challenged the order admitting the 2007 will to probate or the order appointing Mary as executrix of Cleo's Estate within the statutorily proscribed six month period. (*Id.*)

The Brothers subsequently filed a partition suit in the Virginia Beach Circuit Court that sought to have the Estate's lone asset, a house located at 220 85th Street in Virginia Beach, Virginia (the "Property"), partitioned among the family members who would have been Cleo's intestate heirs. The Brothers proceeded on the theory that, if the 2007 will was invalid, the

Estate descended to the heirs through the laws of intestacy. Both Mary and James were made parties to the partition suit, but only Mary responded. James was found to be in default. (*Id.* at 4.) In September 2008, during a mediation session, the Brothers, Mary and James reached a tentative settlement agreement. However, when it came time for the parties to sign this tentative agreement, Mary refused. In November 2008, Mary and the Brothers revised the September 2008 agreement by hand and signed it. (James was not a party to the amended November 2008 agreement.) In the November 2008 agreement (the "Agreement"), the Brothers and Mary agreed that Mary would step down as executor, a neutral third party would be appointed, and that Mary and the Brothers would split the proceeds from the sale of the Virginia Beach Property 50/50. The Agreement did not change the 2007 will's gift of $100 to James. The Agreement also provided that the new fiduciary would manage and sell the Property and also provided that, "to the extent that the terms of the [Agreement] are in conflict or in question, the executor shall resolve it in his or her sole discretion." (*Id.*) Once the parties signed the Agreement, the Brothers nonsuited the Virginia Beach partition suit.

Under the terms of the Agreement, Karen Fortier ("Fortier") was appointed as "Administratrix, *c.t.a.*" by the Norfolk Circuit Court on July 1, 2009. (Comm'r's Rep., 5.) Fortier was also granted power to sell the Property. (*Id.*) Sections 5(e), (f), and (g) are the three key provisions of the Agreement. They deal with who is to collect rents from the Property and how those rents are to be used. They are quoted below in full:

> e. During the Pending Period, Mary will become the acting Landlord for Unit A of the Property, taking on all responsibilities as a fiduciary to B[ryan] and G[regory] and J[ames] in that capacity. Mary will be responsible for the reasonable upkeep, repair, and management of Unit A. Mary will collect any and all rents for Unit A for her sole use and be responsible for all income taxes incurred after September 15, 2008, and liabilities arising from any use of Unit A.
>
> f. During the Pending Period, the Firm[1] will, for its regular management fee, manage and rent out Unit B of the Property, using its best business judgment. The Parties agree to expeditiously sign any management agreement necessary to facilitate this provision. The Firm will be responsible for all management duties, including decisions regarding rental amounts, repairs, and other associated costs. If there are any questions that need to be decided by the Parties, the Parties

---

[1] The hand annotations on the Agreement indicate that the term "the Firm" is defined to mean the Executor. This Court interprets this to refer to Fortier as administratrix of the Estate.

agree that a decision reached unanimously by the attorneys for Mary and B[ryan] & G[regory] will bind the Parties. The Firm will collect rents from Unit B (the Rents).

g. The Rents will be distributed in the following manner of succession:

1. The Firm will take its fee from the Rents.

2. Any and all outstanding taxes assessed against the Property will be paid.

3. Any current taxes or other debts of the Property are paid.

4. Any remainder of the Rents will be escrowed by the Firm, and distributed at closing of the sale of the Property proportionately to the ownership interests of the Parties.

Mary does not contest that she subsequently collected *all* of the rents from Units A and B, and she has never accounted to anyone for them. (*Id.* at 6.) Additionally, Mary has testified that she did not pay any real estate taxes or maintenance costs associated with the Property. (*Id.*)

The value of the Property declined dramatically since the 2010 tax year, when it was valued at $724,200. By early 2010, Fortier had a professional appraisal of the Property conducted. This appraisal established the value of the Property at $500,000. On March 24, 2010, this Court ruled that Fortier could sell the Property for less than the 2008 Agreement provided, but could not sell the Property for less than $500,000. At this time, this Court also granted Fortier the broad fiduciary powers contained in Virginia Code § 64.1-57. (*Id.*) Fortier moved this Court to allow her to accept an offer of $500,000 cash in hand for the Property on April 15, 2010. (*Id.*) At that same hearing, Mary objected to Fortier's accepting the $500,000 offer on the basis that there was another alleged offer to purchase the Property for $505,000. The $505,000 offer was from Mary to purchase the Property, and the evidence strongly suggested that Fortier did not believe that Mary was in a financial position to be able to make such an offer. On April 15, 2010, this Court confirmed Fortier's ability to accept the $500,000 offer for the Property. This Court agreed that the best contract price is not necessarily the highest price offered. (*Id.* at 7.)

Occurring simultaneously during these protracted court battles, the Property had a tenant in Unit B. This tenant was a close friend of Mary's. Fortier wanted the tenant to move out so that the Property could be more effectively marketed and sold, but Mary disagreed. Fortier filed eviction proceedings against the tenant on behalf of the Estate, and Mary appeared in court and testified on behalf of the tenant in both Virginia Beach General District and Circuit Courts. During the appeal hearing in the Virginia Beach Circuit Court, Judge Thomas Padrick stated from the bench that Mary had deliberately interfered with Fortier's administration of the Estate. He

further stated that it was his belief that Mary had helped the tenant hold the Property hostage. (*Id.* at 8.) Additionally, Mary interfered with Fortier's effective administration of the Estate by disrupting and preventing a number of home inspections from appraisers, surveyors, and exterminators. Mary even went so far as to file a *lis pendens* on the Property. (*Id.*) Eventually the original potential purchaser walked away from the deal because of the protracted delays, and the Property later sold for $438,600. This Court approved that sale price on June 30, 2011. That sale closed, and Fortier is now in possession of the proceeds.

### III. *Mary's Objections and Exceptions to the Commissioner's Report*

In her objections to the Commissioner's Report, Mary objects to the manner and procedure in which the Commissioner gathered and considered evidence. Mary contends that there should have been an evidentiary hearing so that her counsel could cross-examine the parties, especially Fortier. (Objections and Exceptions, ¶ 2.) Additionally, Mary objects to the Commissioner's findings regarding the diminution in value of the Property. Mary contends that the Commissioner erred in holding that Mary acted in bad faith to interfere with the sale of the Property for $500,000. Mary contends that there was no showing that the buyer was in any position to actually close on the sale of the Property for $500,000. Mary further suggests that, had she been able to introduce evidence before the Commissioner, she would have been able to show that the buyer was actually not ready, willing, and able to purchase the property for $500,000.

Mary also objects to the Commissioner's Report on the grounds that the parties had allegedly entered into a revised settlement agreement. It is Mary's position that, while the plain language of the November 2008 Agreement granted Mary Unit A and the Brothers Unit B, a series of emails between Mary and Fortier indicated that the arrangement had allegedly been altered so that Mary was to have control of Unit B's rents and the Brothers were to have control of Unit A's rents. (*Id.* at ¶ 4.) Mary further claims that the Commissioner ignored this series of emails in making his determination. Basing her position on the assumption that she had full control of Unit B, the rented unit, Mary argues that she properly collected all of the rents from the tenant in Unit B and suggests that it is not her fault that the Brothers did not decide to find a tenant for their half of the duplex. (*Id.*) This Court agrees with the Commissioner and rejects Mary's contention that the November 2008 Agreement was altered or revised in any manner by Mary's unilateral efforts to modify the Agreement.

Mary further objects to the fact that the Commissioner concludes that Fortier was not shown a copy of the $505,000 offer ahead of a hearing before this Court. It is Mary's position that a copy of the $505,000 offer was

faxed to Fortier in advance of a hearing before this Court. Mary contends that any ruling on this matter constitutes a trial within a trial and is beyond the purview of the Commissioner. (*Id.* at ¶ 5.) To this end, Mary contends that Fortier was required to accept the highest valued offer for the Property and erred in accepting the $500,000 offer when an offer of $505,000 was on the table. (*Id.* at ¶ 6.)

Mary also objects in several ways to the proceedings before the Commissioner. Primarily, she objects to the Commissioner's findings of fact because no evidentiary hearing was held, and she contends that the post-hearing submissions do not constitute evidence that can be considered by the Commissioner. (*Id.* at ¶ 8.) Mary also objects that there were no transcripts of earlier proceedings available to the Commissioner at the hearing. Mary is especially concerned that she was allegedly not able to cross-examine any witnesses and that no evidence was submitted to the Commissioner except through post-hearing submissions.

Finally, Mary objects to the Commissioner's adoption of Fortier's recommendation that the doctrine of equitable retention be applied to allow the Estate to withhold a portion of Mary's share of the proceeds from the sale of the Property as payment of debts owed by Mary to the Estate. Specifically, Mary objects to the following allocations against her share of the proceeds:

1. Delinquent real estate taxes in the amount of $35,285;
2. Current real estate taxes in the amount of $8,301;
3. Legal fees incurred by Fortier on behalf of the Estate in the amount of $28,018.50;
4. Fiduciary compensation in the amount $20,537;
5. Court reporter and transcript fees in the amount of $728.25;
6. Hazard insurance in the amount of $4347.80;
7. Miscellaneous expenses in the amount $2,510;
8. TowneBank loan interest in the amount of $7,210;
9. Security for the property in the amount of $5,640;
10. Electrical bills in the amount $180;
11. Cleaning charged for Unit A in the amount of $200;
12. Martha Eppes' fees as administrator in the amount of $3,033;
13. Funeral expenses;
14. Lawn care costs;
15. Locksmith charges;
16. Real property diminution in value in the amount of $61,400.

## IV. *Analysis*

### A. *Standard of Review*

A Commissioner of Accounts is a highly specialized office within the Commonwealth of Virginia. The Commissioner of Accounts may be viewed as "a Commissioner in Chancery to whom a specific jurisdiction or specialized duties are granted." *In re Trustee's Sale of Property of Willie Brown*, 67 Va. Cir. 204, 211 (Norfolk, 2005). The role of the Commissioner of Accounts is "to review accounts and make rulings, which, unless exceptions are filed and sustained, become confirmed and thereby equal in dignity to the rulings of the Court." *Id.* (citing Va. Code. Ann. §§ 26-33, 26-34).

Once a Commissioner of Accounts has made a report, objecting parties have fifteen days to file objections and exceptions to the report. In ruling on those objections and exceptions, the circuit court should sustain the rulings of the Commissioner "unless it plainly appears, upon a fair and full review, that the weight of the evidence is contrary to his findings." *Hudson v. Clark*, 200 Va. 325, 329 (1958). Additionally, "although the trial court is given power of review over his findings, it cannot arbitrarily disturb the report, if it is supported by sufficient proof." *Id.* The rule in *Hudson* "applies with particular force to a commissioner's findings of fact based upon evidence taken in his presence . . . but is not applicable to pure conclusions of law. *Hill v. Hill*, 227 Va. 569, 577 (1984) (citations omitted).

### B. *James Eppes's Objection to Distribution*

On December 5, 2012, James G. Eppes ("James"), Cleo Eppes' son, filed an objection to the proposed distribution of the Estate under the Agreement. The basis of James's objection is that "[a]n agreement entered into by the legal heirs of a decedent regarding the manner in which the estate is to be administered and distributed requires the participation of all legal heirs, and not a select few." (James G. Eppes' Obj. to Distribution Pursuant to Revised Settlement Agreement, 4.) Specifically, James objects that he was not allowed to participate in the negotiations that resulted in the November 2008 Agreement between Mary and the Brothers. James contends that *Thomas v. Best*, 209 Va. 103 (1968), controls in this situation. In that case, the Virginia Supreme Court held that a settlement agreement pertaining to a decedent's estate was "unjust because it benefited the heirs and distributees who were parties to the agreement, but provided no benefit for the other heirs." *Id.* at 109-10. This Court is not persuaded by James's argument and distinguishes *Thomas* from the case at bar.

In the present case, there *is* a probated will, the 2007 will, which bequeathed $100 to James. James's objection fails to recognize that the

2007 will was probated and that no objections to that will were timely filed. The 2007 will was probated on May 23, 2008. Under Virginia Code § 64.1-78, James had six months to appeal the order admitting the will to probate. Additionally, James had one year to petition the court to impeach the 2007 will. He did *neither* of these two things. The Estate is being distributed according to the probated 2007 will, not simply by an agreement between some of the beneficiaries. In fact, the Agreement between Mary and the Brothers arose from a partition suit in Virginia Beach, not as a result of a will contest or any other probate matter. The Virginia Beach Circuit Court entered a default judgment against James in that partition suit, and, as part of the Agreement, the Brothers agreed to nonsuit the partition suit. Finally, the Agreement only alters Mary's distribution under the 2007 will. The Agreement in no way affects the 2007 will as it impacts upon James's portion of the distribution.

This Court finds that James Eppes has no present standing to object to the Agreement, that the probated 2007 will bequeathed $100 to him, and that the Agreement between Mary and the Brothers affects only Mary's distribution under the 2007 will and has no effect on James's distribution. James's objection is hereby overruled, and he is only entitled to the $100 left to him under the 2007 will.

## C. *Mary Martin's Objections to the Commissioner of Accounts' Procedure*

Mary's primary objection to the Commissioner's Report concerns the procedural circumstances surrounding the issuance of the Report. In paragraph two of her objections, Mary states that she "objects to the manner and procedure in which the Commissioner of Accounts considered other evidence on the grounds that there should have been an evidentiary hearing so that counsel could cross-examine the parties, particularly Karen Fortier, who did not take the witness stand to be cross-examined about her expenses." (Objections and Exceptions to Report of Comm'r of Accounts, ¶ 2.) Mary also objects to the Commissioner's reliance on post-hearing submissions. Specifically, Mary objects on the grounds that "post hearing written submissions are not evidence. There was no ability to examine Fortier. The only evidence was the testimony of Lionel Hancock, Mary Martin, and James Eppes. There was no evidence taken contrary to what the Commissioner of Accounts has stated and therefore the Commissioner of Accounts erred." (*Id.* at ¶ 8.) In a supplement to her initial objections, Mary also contends that the procedure before the Commissioner lacked due process because "there are no pleadings, no opportunity for rebuttal nor hearing before the Commissioner." (Additional Objections and Exceptions to Report of Comm'r of Accounts, ¶ 1.) This Court is not persuaded by the arguments supporting these objections. Accordingly, for the reasons that

follow, this Court confirms and sustains all of the procedures that led to the creation of the Commissioner of Accounts' Report.

The Commissioner of Accounts is invested with broad authority to conduct proceedings in any appropriate manner. According to the *Manual for Commissioner of Accounts*, a Commissioner's role includes:

> Serving as a quasi-judicial official; auditing fiduciary accounts properly; protecting the public and creditors; implementing the terms of the will, trust, and court orders; protecting the interest of taxing authorities; implementing Titles 26, 31, 37.1, 55, and 64.1 of the Virginia code; serving as an informal mediator between the parties at interest; protecting the rights of persons under disabilities; recognizing fraud or the opportunity for fraud; and educating practitioners and users of the system.

*Manual for Commissioners of Accounts*, § 20.202 (3d ed. 2004). Thus, the Commissioner clearly acted within his authority in conducting the hearing in the manner in which it was conducted. Additionally, *all of the parties in this case agreed to the procedure to which Mary now objects*. Toward the end of the September 27th hearing before the Commissioner of Accounts, there was a lengthy discussion by counsel regarding a briefing and submissions schedule. At no time during this discussion did Mary or her attorney object to the proposed procedure. (*See* Tr. 92-98 (Sept. 27, 2011).) In fact, at the end of the hearing, the Commissioner asked if there was any other business that needed to be addressed, and Mary's counsel said "That's it." (*Id.* at 98:2.) Mary's acquiescence to the procedures utilized at the September 27, 2011 hearing, and her failure to take any actions to remedy the alleged procedural defects in the months following the hearing amount to Mary's being equitably estopped from objecting to the Report on the grounds of allegedly defective procedures.

A party will be equitably estopped, generally, when that person, "by his statements, conduct, action, behavior, concealment, or even silence, has induced another who has a right to rely upon those statements, or the like, and who does rely upon them in good faith to believe in the existence of the state of facts with which they are compatible and act upon that belief." 7A M.J., *Estoppel*, § 14. Once a party has been equitably estopped, she will "not be allowed to assert, as against the [reliant party], the existence of a different state of facts from that indicated by [her] statements or conduct, if the [reliant party] had so far changed his position that he would be injured thereby. In other words, an estoppel exists when a person has brought about or allowed such conditions as make it inequitable for him to claim a right to which he would otherwise be entitled." *Id.* This Court finds that Mary, by her counsel, clearly agreed to the procedures governing the issuance of the Commissioner's Report. Additionally, Mary had the opportunity to call

Fortier, who was present at the September 27, 2011, hearing, as a witness before the Commissioner and simply failed to do so. Lastly, Mary failed to raise her procedural objection at any time between the September 27, 2011, hearing and March 9, 2012, the date the Report was filed with this Court. As a result, Mary is barred from objecting to the procedure surrounding the Commissioner's issuance of the Report.

## D. *The Commissioner of Accounts' Findings as Stated in the Report*

The following findings of law and fact presented in the Commissioner of Accounts' Report are confirmed by this Court.

### 1. *The Commissioner's Legal Conclusions*

The Commissioner's Report made several legal findings regarding the rights and obligations of Fortier in her capacity as administratrix of the Estate. First, the Commissioner determined that the doctrine of equitable retention is applicable in this case. The doctrine of equitable retention recognizes an heir's debt to the estate is simply another asset of the estate, available to the administrator to use as currency. In Virginia, this doctrine has been extended to allow administrators to withhold a portion of an heir's distribution as settlement of a debt owed to the administrator individually. *See Preston v. Davis' Ex'rs*, 102 Va. 178 (1903). Additionally, an administrator is required to prudently manage the assets of the estate as if it were his own property. *See generally* Va. Code § 64.1-57(g), (n). Moreover, fiduciaries are specifically authorized "[t]o compromise, adjust, arbitrate, sue on or defend, abandon, or otherwise deal with and settle claims, in favor of or against the trust or estate as the fiduciary deems best, and his decision shall be conclusive." Va. Code § 64.1-57(g). The Commissioner's Report properly authorizes Fortier to withhold certain costs charged against the Estate from Mary's share of the proceeds from the sale. The Report concludes that, but for Mary's dilatory actions, many of the costs associated with administering the Estate would have been avoided, and it is only equitable that those costs be assessed against Mary's share of the Estate.

Second, the Commissioner of Accounts properly applied the doctrine of equitable conversion and power of sale to the facts of this case. The doctrine of equitable conversion holds that, when a will directs real estate to be sold, that real estate is immediately converted to and treated as personalty upon the testator's passing. *See Robinson v. Lee*, 205 Va. 363 (1964); *Marcy v. Graham*, 142 Va. 285 (1925). The doctrine applies in the case at bar because the 2007 will, as amended by the November 2008 Agreement, directs Fortier to sell the Property. By instructing Fortier to sell the Property, the 2007 will also gave to Fortier a power of sale. This power of sale, coupled with the statutory fiduciary powers of § 64.1-57, authorized Fortier to

use her discretion in accepting a contract for the sale of the Property. The Agreement and this Court's orders make it clear that Fortier was to manage the Property in her discretion, without input from the Brothers or Mary. Once the Property was sold, the proceeds were converted into an asset of the Estate to be managed in Fortier's discretion as administratrix.

## 2. *The Commissioner's Expense Allocations*

This Court confirms the Commissioner's finding that, but for Mary's actions, the Estate would not have had to pay any delinquent real estate taxes. The Commissioner's finding that $35,285.07 in delinquent real estate taxes may be properly withheld from Mary's share of the Estate is confirmed. While it is undisputed that the Estate normally would be responsible for paying real estate taxes on the Property, following Cleo's death, from the time of Cleo's death in 2007 until the sale of the Property, Mary, by her own admission, was in total control of the *only* source of funds with which to pay real estate taxes, namely the rental income from Unit B of the Property. Mary failed to pay any real estate taxes on the Property following Cleo's death and kept all of the rental income for herself. Doing so constitutes a breach of the Agreement, and Fortier is well within her right to withhold the delinquent real estate taxes from Mary's share of the Estate. Similarly, this Court confirms the Commissioner's finding with regard to the current real estate taxes, $8,031.00, owed on the Property. Moreover, this Court also confirms the Commissioner's findings that Fortier is authorized to reduce Mary's share of the Estate by $7,210.11. This figure represents the amount of interest that has been paid on a loan from TowneBank. The sole purpose of this loan was to obtain funds to pay off delinquent real estate taxes and to prevent the Property from being sold at a tax auction by the City of Virginia Beach. Were it not for Mary's actions in withholding the rents collected from Unit B from Fortier and delaying the sale of the Property, the Estate would not have had to take out this loan and there would have been no additional expenses for interest paid on the loan.

Additionally, this Court confirms the Report's allocation of $782.25 of $973.25 in court reporter and transcript fees to Mary and finds that Mary's share of the Estate will likewise be reduced in the amount of $228.90, representing the costs for copies and other miscellaneous expenses. This Court also confirms the Report's findings that Mary's share of the Estate is to be reduced by $4,347.80 for the cost of hazard insurance on the Property, again due to Mary's actions delaying the sale of the Property. This Court will also confirm the findings of the Report with regard to several other costs associated with maintaining the Property before it was ultimately sold. These costs include $5,640, representing the entire cost of security for

the property;[1] $180 of the $480.78 owed for electrical bills for the Property; $200 for cleaning Unit A of the Property; and $243.15 of the $334.45 charged by a locksmith for changing the locks on the Property. All of these sums are to be assessed against Mary's share of the Estate. Similarly, this Court will confirm the Report's findings that the Estate shall be responsible for paying the entire amount owed to the Commissioner of Accounts, the entire amount owed on the estate bond premiums, the entire amount owed for lawn care services for the Property, the entire amount owed for debt and demand advertisements; the entire amount owed for an extra appraisal of the Property, and the entire amount owed for an open house advertisement.

Over Mary's objection, this Court will confirm the Commissioner's finding that Fortier is entitled to charge Mary's share of the Estate $28,018.50 for legal fees incurred by Fortier and $20,537.00 for Fortier's compensation as fiduciary. This Court finds that Mary's dilatory actions directly caused Fortier to incur a tremendous amount of legal expenses she would otherwise not have had to incur. There were a number of different legal proceedings in which Fortier could reasonably expect to have been called as a witness. Because Fortier was granted the statutory powers of § 64.1-57, the decision to hire an attorney was solely in her discretion. This Court agrees with the Commissioner that the Estate, not Mary, should pay $2000 of Mr. Alperin's legal fees arising out of his representation of the Estate in the eviction proceedings in Virginia Beach. However, all other attorney's fees paid by Fortier should be paid out of Mary's portion of the Estate. Similarly, this Court confirms the Commissioner's finding that Mary's portion of the Estate be reduced by $20,537 for the increased fiduciary compensation costs incurred as a direct result of Mary's delaying tactics and her obstreperousness in resisting the sale of the Property under the $500,000 contract. This Court accepts the Commissioner's finding that, prior to May 14, 2010, Fortier's efforts were primarily focused on administration of the Estate. On that date, this Court entered an order reaffirming that Fortier had broad discretionary powers in accepting offers to purchase the Property. This Court found that Fortier was not bound by the Agreement's required sales price of $650,000, and this Court authorized Fortier to accept any offer she deemed appropriate as long as it was at least $500,000. This matter has been dragged out for an extended time as a direct result of Mary's delaying actions, and this Court finds it appropriate that Mary's share of the Estate be reduced to reflect the additional fiduciary compensation fees associated with the prolonged process.

It is clear from the record, both at the hearings before this Court and the hearing before the Commissioner, that Mary paid $8,450 in funeral expenses for Cleo. This Court finds that she should be reimbursed for those

---

[1] This Court finds that the disruptive actions of Mary and her tenant, including denying access to the Property to various inspectors who were attempting to facilitate the sale of the Property, directly caused the need for security for the Property.

expenses from the Estate. Additionally, this Court rules that the Estate is to reimburse Mary for the cost of probating the 2007 will. The record indicates that Mary paid $867.50 in filing fees to the Norfolk Circuit Court; she is entitled to reimbursement for this amount.

This Court rejects Mary's contention, however, that she is entitled to reimbursement for $21,435.09. Mary argues that she paid this amount to the City of Virginia Beach to cover back taxes from 1999 until 2005. It is important to note that Cleo was still alive at the time Mary paid these back taxes. Mary contends that her paying these back taxes constituted a loan to her mother and, as such, the amount she is owed should be viewed as a debt of the Estate. Unfortunately for Mary, the Agreement, signed in November 2008, specifically requires all debts of the Estate to be disclosed *within thirty days*. Mary raised the issue of her mother's alleged $21,435.09 debt for the first time in 2011, well beyond the thirty-day window provided in the Agreement. This Court is convinced that the alleged loan of $21,435.09 is not a sum of money that would easily be forgotten. Surely Mary should have been able to produce evidence of this debt within thirty days of signing the November 2008 Agreement if this amount actually represented a loan by Mary to her mother. If Mary wanted to have this amount counted as a debt of the Estate, she should have abided by the terms of the Agreement she helped to create and brought it to light in 2008, not three years later.

This Court rejects a portion of the Commissioner's finding that Martha Eppes is entitled to compensation as a fiduciary in the amount of $4,367. While it is likely that Martha thought she was acting in the best interest of the Estate and the Brothers, her sons, by qualifying as the administrator of a small estate, the Estate is in no way a small estate. Even though the Estate only has one main asset, that asset was, and continues to be, worth far more than the statutory maximum for a small estate. Martha Eppes is not owed any compensation from the Estate for her service as a fiduciary. Martha, however, can be reimbursed for any out of pocket expenses she incurred while attempting to qualify as the administrator of a small estate. These expenses are to include travel expenses associated with Martha's travel from Texas to Norfolk and any filing fees paid on behalf of the Estate. Martha is also entitled to reimbursement for any legal fees she incurred attempting to qualify as administrator of the Estate. This Court confirms the Commissioner's finding that Martha is entitled to legal fees up to the point where the law firm of Williams Mullen's representation morphed from representing Martha as administrator to representation of the Brothers and their interests. This Court will confirm the Commissioner's findings that Martha is entitled to $48 of costs, $320 in airfare, and $3,033 in legal costs. This Court does not sustain the Commissioner's findings that Martha is entitled to any compensation for her time.

Finally, this Court will confirm the Commissioner's finding that Fortier is empowered to reduce Mary's share of the Estate by $61,400. This figure

represents the diminution in value for the sale of the Property. The record in this case clearly reflects that Fortier was authorized to accept the $500,000 offer as early as April 15, 2010. On that day, this Court entered an order specifically authorizing Fortier to accept an offer of that value. This was a cash-in-hand contract to purchase the Property "as is." Between April 2010, and late February/early March 2011, Mary engaged in a systematic course of conduct designed to delay and prevent the sale of the Property for $500,000. This conduct included testifying on behalf of the tenant of Unit B in eviction proceedings in Virginia Beach, preventing surveyors and home inspectors from accessing the Property, and generally holding the Property hostage. Finally, in early 2011, the buyer who had tendered the $500,000 contract backed out of the sale as a result of the protracted delays. Ultimately the Property sold for $438,600 in June 2011. Mary's actions are directly responsible for the loss of $61,400 in the sales price of the Property. Without her intentional interference, the Property would have sold for $500,000. This Court confirms the Commissioner's finding that Fortier is authorized to reduce Mary's share by $61,400 to offset the reduction in price the Property fetched on the open market.

## V. *Conclusion*

In conclusion, this Court confirms the Commissioner's Report in its entirety, with one exception, this Court does not sustain the Commissioner's findings that Martha Eppes is entitled to any compensation for her time spent as administrator of the Estate. Additionally, this Court rejects Mary's claim that she is entitled to repayment of an alleged $21,435.09 loan extended to Cleo before her death and overrules all other objections to the Commissioner's report.